**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HARPREET SINGH RAI<br><br>*Plaintiff*,<br><br>v.<br><br>OURARING INC., OURA HEALTH OY,<br>OURA INC., SEAN BRECKER, EURIE KIM,<br>and DAVID SHUMAN,<br><br>*Defendants*. | CASE NO. _____<br><br>**COMPLAINT FOR EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Harpreet Singh Rai ("Plaintiff" or "Rai") brings this Complaint against Defendants Ouraring Inc. ("Ouraring"), Oura Health Oy ("Oura Oy"), Oura Inc. (collectively, with Ouraring and Oura Oy, "Oura" or the "Company"), Sean Brecker, David Shuman, and Eurie Kim for misconduct in connection with Oura's repurchase of all of Rai's shares in the Company and the voting rights associated with those shares.

## I.    INTRODUCTION

1.    This case is about a deliberate scheme by Oura to strip its former CEO, Harpreet Singh Rai, of his voting power and buy out his equity in the Company at a bargain-basement price, right before disclosing a major strategic investment that dramatically increased Oura's value (and its share price).

2.    Defendants did not simply buy back stock from a departing executive. They engineered a liquidity trap to extract Rai's entire stake in Oura at an artificially depressed price. Defendants enacted this scheme right before Oura disclosed a major strategic investment that they knew would drive the Company's share price significantly higher.

1

3.      Oura's stock was closely held and did not trade on the public markets. Before Oura initiated the liquidity trap, Rai was nonetheless permitted to freely sell his stock to "bona fide arms-length third parties" subject only to certain notice requirements and a right of first refusal held by the Company and major shareholders. Those rules protected Rai, who had earned his Oura shares by investing years of time to help Oura succeed. Defendants secretly changed those rules. Without informing Rai, Defendants amended the Company's shareholder agreement to claw back Rai's rights to sell his Oura shares.

4.      The surreptitious amendment gave Defendants complete control over who could sell Oura shares, at what price, and to whom. Defendants then exercised that control by repeatedly blocking Rai's attempt to sell his stock to third parties, for nearly two years. Defendants' actions left Rai with millions of dollars of Oura shares, but no path to liquidity, except on terms dictated by Defendants.

5.      By September 2024, Defendants had put in motion a massive valuation-moving transaction, including a strategic investment tied to Oura's financing plans. That transaction was the precise type of progress sought by early round investors in a startup; their shares would gain value. However, rather than meeting their duties and disclosing that reality to shareholders, Defendants moved to buy stock back from the shareholders they had boxed in, while the price stayed artificially suppressed. And Rai was a victim of this scheme.

6.      As part of the scheme, Defendants hired a broker to approach shareholders with an offer to sell their closely held stock to a "Company-approved" buyer. Having been blocked by the Company from selling shares previously, Rai approached this new opportunity in good faith and engaged with the broker. After Rai agreed to keep the buyer's identity confidential, the broker revealed that the buyer was the Company itself.

2

7.      When Rai pressed for basic deal facts, Oura, though CFO Sean Brecker, responded with statements that were false and misleading and failed to disclose material information about Oura's upcoming financing.

8.      Brecker's statements were designed to keep Rai in the dark about the Company's true valuation and to manipulate Rai into selling his shares at an artificially deflated price.

9.      Brecker told Rai that Oura was purchasing Rai's shares to remit those shares to an existing investor who was not strategic. (A strategic investor is one who contributes capital primarily to advance a business strategy, rather than to simply earn a financial return.)

10.      Defendants also supplied a capitalization table and related information that concealed the financing and its valuation impact. Defendants controlled the information flow and used that control to manipulate Rai's decision to sell shares back to Oura.

11.      Defendants' misstatements and omissions were material. Major shareholders like Rai were contractually entitled to updates on the Company's finances and material financing transactions—regardless of whether the shareholders intended to retain or sell their shares. Defendants failed to use reasonable care in communicating core financing facts that went to the heart of the deal.

12.      The misstatements were also deliberate. Defendants knew that Rai's decisions depended on the exact information that they hid, including whether a strategic investor stood behind the transaction and whether Oura had secured financing that would increase the Company's valuation. Accordingly, Defendants intended for Rai to rely on their statements and on their silence and for Rai to believe that he had all material information about the value of his shares.

13.      The plan worked. On September 22, 2024, Rai executed the agreements Defendants put in front of him, sold his entire stake in Oura at roughly $10 per share, and surrendered the

3

voting rights tied to those shares. Once Defendants secured Rai's shares and voting rights, Oura disclosed the strategic transaction that Defendants had concealed.

14.    The market repriced Oura accordingly. Oura's share price immediately increased to approximately $25 per share. By September 2025, Oura's share price increased to approximately $54 per share, reflecting a dramatic valuation jump that Defendants withheld while they bought Rai out.

15.    In sum, Defendants' conduct was not accidental. It was a coordinated scheme: restrict liquidity, wait until a valuation-moving transaction was inked, hide that transaction from existing shareholders, solicit repurchases at deflated prices, and then disclose the transaction after Defendants had locked in the discounted buyback.

16.    The harm is enormous. Rai sold at roughly $10 per share based on Defendants' deceptive conduct. Defendants' misconduct robbed Rai of the upside from the concealed valuation inflection point, costing him approximately $142 million in lost value.

17.    This scheme was not the first time that Defendants had attempted to mislead shareholders by leveraging an undisclosed financing event. Board member David Shuman had tried a similar ploy in July 2020, after Oura had reached terms on a Series C investment round. Before that round was public, Shuman tried to persuade Oura's founders to sell the balance of their shares at a lower price. But the founders declined, and they eventually sold their shares in a tender offer in which they were able to appreciate the gains from the Series C investment.

18.    Unfortunately, the scheme worked when deployed against Rai. And each Defendant played a role. Ouraring Inc. and Oura Health Oy executed the repurchase and the deceptive course of conduct. Board chair Eurie Kim blocked Rai's attempted secondary sales. Brecker delivered the misstatements and omissions that closed the deal. David Shuman orchestrated the stealth

amendment to the shareholder agreement and the subsequent stock buybacks from shareholders. Both Shuman and Kim also exercised control over Oura's actions and enabled the misconduct that forms the basis for liability here.

19.    Rai brings this action to rescind his sale of shares (along with other equitable relief), and to hold Defendants accountable for the misconduct that drove this transaction.

20.    Rai asserts claims for equitable fraud and federal securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 to restore Rai's ownership in the stock that he was falsely induced into selling.

21.    Separate and apart from those fraud claims, Rai asserts claims for breach of fiduciary duty, negligent misrepresentation, and violation of New Hampshire securities laws, seeking the same equitable relief.

## II.    PARTIES

22.    Plaintiff Harpreet Singh Rai is a citizen of New Hampshire who resides in Meredith, New Hampshire. Rai served as President and then CEO of Oura from May 2017 to December 2021. Rai had acquired 3,268,795 shares in Oura as compensation for his service to the Company. On September 22, 2024, Rai agreed to sell those shares back to Oura for a net purchase price of $32.7 million and forfeit his voting rights in those shares pending the closing of that transaction.

23.    Defendant Ouraring Inc. (defined above as "Ouraring") is a Delaware corporation with its principal place of business at 222 Kearny Street, 7th Floor, San Francisco, California.

24.    Defendant Oura Health Oy (defined above as "Oura Oy"), formerly known as "JouZen Oy," is a Finnish company with its principal place of business at Elektroniikkatie 10,

90590 Oulu, Finland. Oura Oy was the parent company to Ouraring until 2026 when Oura redomiciled to the United States.

25.     Defendant Oura Inc. is a Delaware Corporation that was incorporated on January 28, 2026. On or around March 31, 2026, as a part of a re-domiciliation process, Oura Inc. became the successor company to Oura Health Oy and the parent of Ouraring. The Oura entities operate as one. Each entity shares the same leadership team and the same Board of Directors. Rai previously served as the CEO of *both* Oura Oy and Ouraring. As stated above, therefore, the Oura entities will be referred to collectively as "Oura" or the "Company."

26.     Defendant Sean Brecker is a citizen of California who resides in Los Angeles, California. Brecker has been the Chief Financial Officer ("CFO") of Oura since 2023. Brecker was the principal spokesperson through which Oura made the false statements and misleading omissions alleged here.

27.     Upon information and belief, Defendant David Shuman is a citizen of New York who resides in New York, New York. Shuman has served on Oura's Board of Directors since 2016 and has been the Chair of the Board since October 14, 2025. Throughout that time, Shuman has exercised outsized influence over the Board's decision making. Upon information and belief, Shuman was the architect of the scheme to vest the Board with total control over the sale of Oura's shares and to use that control to induce Oura's shareholders to sell their shares back to the Company at artificially deflated prices.

28.     Defendant Eurie Kim is a citizen of California who resides in San Francisco, California. She served as the Chair of Oura's Board from 2019 until 2025, when she was succeeded by Shuman. In her capacity as Chair, Kim blocked Rai from selling his Oura shares on the open

6

market and authorized the scheme to induce Oura's shareholders to sell their shares back to the Company at artificially deflated prices.

29.     At all relevant times, Defendants Kim and Shuman served as directors of Oura and Defendant Brecker served as an officer of Oura. As directors and officers, they owed fiduciary duties of loyalty and care to the Company and its stockholders, including Plaintiff Harpreet Singh Rai.

## III.    JURISDICTION AND VENUE

30.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1332 over all causes of action alleged in this complaint because complete diversity exists between the parties and the amount in controversy exceeds $75,000.

31.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq*.

32.     This Court has personal jurisdiction over Ouraring because it is incorporated in Delaware and maintains general and systematic contacts with the State of Delaware.

33.     The Court has personal jurisdiction over Oura Inc. because it is incorporated in Delaware and maintains general and systematic contacts with the State of Delaware.

34.     This Court has personal jurisdiction over Oura Oy because Oura Oy "consent[ed] to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Delaware or any court of the State of Delaware having subject matter jurisdiction," by executing a Voting Rights Agreement ("VRA") with Plaintiff in connection with Oura's repurchase of Plaintiff's shares. This Action arises under the VRA, which is attached as Exhibit 1.

35.     This Court has personal jurisdiction over Brecker under 10 Del. C. § 3114(b) because he is CFO of Oura Inc. and Ouraring, Delaware-incorporated companies, and the claims asserted herein arise out of actions that Brecker took, and duties that Brecker violated, as an officer of Oura. In his capacity as CFO, Brecker facilitated transactions that were governed by Delaware law under the VRA and thus purposefully availed himself of the forum state. Accordingly, Brecker is a necessary or proper party to this lawsuit.

36.     This Court has personal jurisdiction over Shuman under 10 Del. C. § 3114(a) because he is a Director of Oura Inc. and Ouraring, Delaware-incorporated companies, and the claims asserted herein arise from actions that Shuman took, and duties that Shuman violated, in his role as Director. Upon information and belief, in his capacity as a Director, Shuman approved transactions that were governed by Delaware law under the VRA and thus has purposefully availed himself of the forum state. Shuman is thus  a necessary or proper party to this lawsuit.

37.     This Court has personal jurisdiction over Kim under 10 Del. C. § 3114(a) because she is a Director of Oura Inc. and Ouraring, Delaware-incorporated companies, and the claims asserted herein arise out of actions that Kim took, and duties that Kim violated, in her role as Director. Upon information and belief, in her capacity as a Director, Kim approved transactions that were governed by Delaware law under the VRA and thus has purposefully availed herself of the forum state. Kim is thus a necessary or proper party to this lawsuit.

38.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (c)(2) because Defendants are subject to personal jurisdiction in Delaware and because a substantial part of the events and omissions giving rise to the claims occurred under the VRA, which is governed by Delaware law and permits lawsuits based in equity to be filed in this District. Ex. 1 at 8.

## IV.     FACTUAL ALLEGATIONS

### A.     RAI LEADS OURA FROM 2017 TO 2021, TAKING THE COMPANY FROM A STRUGGLING START-UP TO A MULTI-BILLION-DOLLAR ENTERPRISE

39.     Defendant Oura Oy was founded in Oulu, Finland in 2013 by Petteri Lahtela, Kari Kivelä, and Markku Koskela. Oura developed a product called the Oura Ring, a piece of wearable technology that uses sensors to track health metrics.

40.     According to Delaware's Division of Corporations, Defendant Ouraring Inc. was incorporated in Delaware on October 21, 2014.

41.     In March 2015, Oura introduced their vision of a sleep-tracking smart ring and launched a Kickstarter campaign in August 2015.

42.     Rai purchased the initial generation of an Oura Ring marketed to consumers through that Kickstarter campaign. On information and belief, Rai was one of the first 1,000 people to purchase a first-generation Oura Ring.

43.     By early 2016, Oura was struggling to stay afloat. At that time, the Company had only 10 employees.

44.     On or about April 2016, Kivelä, one of Oura's founders, travelled to New York to attend an industry conference.

45.     During that trip, Rai met Kivelä, by happenstance, at a Whole Foods on 23rd Street in New York City. The two men struck up a conversation because Rai was wearing an Oura Ring. Kivela told Rai that Rai was the first customer Kivela had ever met who was wearing an Oura Ring "in the wild."

46.     At that time, Rai was a portfolio manager at Eminence Capital ("Eminence"), a New York City hedge fund, where he had worked since September 2008.

9

47.    In September 2016, following his meeting with Kivelä and other Oura team members, Rai invested $1 million in Oura. Rai had never made a private investment of that magnitude before but did so with Oura because he had studied wearables in college and was enthusiastic about the Oura Ring as a leading innovation in that burgeoning sector.

48.    Because of that enthusiasm, Rai also recruited other investors to participate in a Series A investment in the company, including future board member, and now Defendant, David Shuman.

49.    Of the $5 million that Oura raised in Series A funding, Rai was responsible for $4.4 million (88%)—investing $1 million himself and raising approximately $3.4 million from other investors.

50.    This money was necessary for Oura's continued operations. After the Series A round was complete, Rai learned that Oura owed approximately $2 million in liabilities.

51.    After he learned about the issues with Oura, Rai, while still employed at his hedge fund, decided to help the company grow—by raising revenues and cutting costs.

52.    Rai started running logistics out of his New York City apartment and set up a FedEx account to ship rings and sizing kits to customers. Before Rai's intervention, Oura had shipped inventory from Finland, which was prohibitively expensive. Rai began shipping product himself from New York, which saved the Company significant money. At times, Rai would personally deliver rings to potential customers or would drop off the deliveries at FedEx on his way to work at Eminence.

53.    Rai also hired a consultant and began an advertising campaign for Oura, charging the expenses to his personal credit card (which would later become Oura's company credit card).

54.     By the end of 2016, Rai was effectively working full time for Oura, in addition to his full-time job at Eminence. Shortly thereafter, Oura recruited Rai to run the business in the United States.

55.     At that time, the Company's valuation was approximately $20 million.

56.     Rai served as President from May 2017 until May 2018 and as CEO from May 2018 until December 2021. Given the Company's perilous finances when he started, Rai agreed that he would receive a relatively low salary, with the majority of his compensation to come in the form of Oura stock. Ultimately, Rai bet on himself to save Oura and transform it into a viable company. It was a successful bet.

57.     Under Rai's leadership, Oura experienced meteoric growth—expanding from the fledgling 12-employee $20 million company he inherited to a $2.55 billion company with hundreds of employees.

58.     Rai and Oura did not part ways on good terms. On November 12, 2021, after the Company refused to comply with its contractual promises of compensation, Oura terminated Rai without cause and misrepresented to employees that Rai had resigned.

59.     When Rai departed Oura, he owned over 3,267,794 shares in the Company. Rai acquired this stock through his extraordinary services as CEO.[1]

**B.     OURA'S BOARD CHANGES THE SHAREHOLDER AGREEMENT WITHOUT NOTIFYING RAI**

60.     On March 18, 2022, Oura released an Amended and Restated Shareholders Agreement (the "March 2022 Shareholder Agreement") that governed Rai's rights as an Oura

---

[1] Rai is entitled to hundreds of thousands of additional shares as compensation, but he has been wrongly deprived of those shares a result of Oura's refusal to honor Rai's compensation agreement. Those issues are being adjudicated in *Harpreet Singh Rai v. Ouraring Inc., Oura Health Oy*, 3:25-cv-09654 (N.D. Cal.) (Dkt. No. 1). There is no dispute that Rai had received the 3,267,794 million shares addressed in this Complaint.

shareholder. Oura never sent Rai the March 2022 Shareholder Agreement, and consequently, Rai never executed it.

61.     The March 2022 Shareholder Agreement reduced the number of outstanding votes necessary to amend the shareholder agreement from 75% to 60%.

62.     In all other relevant respects, the March 2022 Shareholder Agreement was identical to the prior version of the shareholder agreement, effective December 28, 2020.

63.     Rai's sizeable position in Oura made him a "Major Shareholder" under the March 2022 Shareholder Agreement. That status entitled him, among other things, to obtain financial information related to the Company and to examine Oura's accounts, records, and "economic position."

64.     That March 2022 Shareholder Agreement permitted shareholders like Rai to sell their equity in Oura to "bona fide arms-length third parties" after providing written notice to Oura and to the other "major shareholders." Under that agreement, Oura and Major Shareholders would have the right to purchase the offered shares "at the same price and subject to the same material conditions" as the proposed sale.  No restrictions applied, however, to sales of preferred shares or to sales of common stock that did not exceed 10% of the seller's holdings.

65.     In short, the March 2022 Shareholder Agreement gave shareholders the freedom to sell their Oura shares to third parties and to negotiate the prices at which those shares would be sold. The Company retained only a right of first refusal.

66.     On or around March 25, 2022, Rai entered discussions with investor Rain Tamm about a sale of Rai's Oura shares. Tamm ran Sienna Partners, a fund that specialized in investments in Northern Europe and the Baltic region and that had experience in tech start-ups. Tamm was keen on purchasing Oura shares in a secondary sale.

67.    Rai and Tamm discussed the secondary sale for weeks and eventually agreed that Rai would sell to Tamm shares worth approximately $1,000,000.

68.    In or around April 2022, Rai entered discussions with Kashif Siddiqui and Don Short of InvestX Capital about an additional secondary sale of Rai's Oura shares. InvestX capital is a Vancouver-based fund that invests in pre-IPO ventures like Oura.

69.    In the midst of Rai's discussions about selling his shares on the secondary market, Oura's Board of Directors—ostensibly together with "the requisite numbers of Oura's shareholders"—voted to approve an Amendment to the Shareholders' Agreement, effective May 12, 2022, which purported to allow "the Board to approve all sales and transfers of Oura shares" (the "May 2022 Amendment").

70.    The May 2022 Amendment further provided Oura's Board with "absolute discretion" to withhold consent for any "Transfer of Equity Securities by any Shareholder."

71.    These terms were a major change from the previous versions of the Oura shareholder agreement. Board approval had never been required for secondary sales of Company common stock.[2]

72.    This was the first time that Oura had amended an operative shareholder agreement. Because the March 2022 Shareholder Agreement had reduced the threshold vote needed for further

---

[2] Since at least 2019, Section 11 of Oura's Articles of Association has contained a provision requiring the Board of Directors to consent to any acquisition of common shares. That provision, however, is expressly nullified by the March 2022 Shareholder Agreement, which provides "that the provisions of the Articles [of Association] shall be for the protection and use against any Transfer in violation of this Agreement, as applicable, and that no approval is required and that the Parties will not use, and hereby waive, their right of redemption under the Articles in connection with the Transfer of Equity Securities that is made in compliance with the provisions of this Agreement."

13

amendments (reduced from 75% to 60%), Defendants were able to force through the May 2022 Amendment, less than two months after publishing an Amended and Restated Agreement.

73.     Upon information and belief, it was David Shuman who proposed the May 2022 Amendment. Shuman wanted the Board to have complete control over the sale of Oura's shares on the secondary market.

74.     Oura never informed Rai about the proposal to amend the SHA—even though he was a Major Shareholder, even though he was entitled to written notice of all communications relating to the shareholder agreement, and even though any amendment to the shareholder agreement had to be executed by at least sixty percent (60%) of the outstanding votes.

75.     Oura's conduct also violated Section 13.2 of the March 2022 Shareholder Agreement, which provided that any "amendment or modification" that "has a disproportionate disadvantageous impact on the rights and obligations of a Shareholder who has not supported such amendment or modification" requires "the consent of such Shareholder."

76.     Shuman's proposed amendment was disproportionately disadvantageous to Rai's rights, a holder of significant amounts of Oura stock without representation on Oura's board. Oura did not inform Rai about the proposal or invite him to decide on the Amendment. And Rai was not notified about the Amendment's approval (or existence) until July 2022.

77.     On or about July 11, 2022, Rai and Sienna Funds executed an agreement whereby Sienna Funds would purchase 85,520 of Rai's shares at a price of $11.69 per share. The negotiated price was based on a $2.1 billion post-money valuation of Oura, discounted at approximately 18%.

78.     On July 12, 2022, Rai emailed Eurie Kim, Michael Chapp (Oura's Chief Operating Officer), and Daniel Welch (Oura's then-CFO) to inform Oura about the secondary sale. Rai sent

this email to comply with the notice requirements of the March 2022 Shareholder Agreement. Rai also attached a completed version of Oura's standard form transfer agreement.

79. On July 14, 2022, Ms. Kim responded: "The Board acknowledges your request for a transfer of stock per the terms of the SHA; but, you might recall that on May 27th, 2022, the SHA was amended to restrict all transfers and sales of Oura shares for the sole purpose of ensuring orderly capital raise processes for the company. We are not in a position to approve this request; but, will let you know as soon as we are able facilitate a transfer or tender opportunity."

80. Rai was stunned that the Board had wrested control over his shares without notifying him. He responded "I am unaware of any changes … to the SHA. Please send me the updated SHA and changes to any resolutions and a copy of any notice for such meeting to discuss or amend such changes."

81. On July 20, 2022, Oura responded through outside counsel: "The notice was distributed to shareholders at the end of May. I can check which email we used for you. Note that this was purely a contractual amendment. As such no formal shareholder meeting was held."

82. Oura had known since December 2021 that Rai's Oura email address was inactive. Rai's personal email address had not changed since he created the account in 2004, and Oura was aware of it. Rai had received notices for Oura's Extraordinary General Meetings and Annual General Meetings at that same personal email address.

83. Upon information and belief, Oura purposely omitted Rai from the distribution list announcing the proposed amendment. Critically, neither Oura nor its outside counsel ever followed up with Rai to confirm "which email we used for you."

84.  Simply put, Rai **never** received formal notice—or any shareholder communication—about the proposed amendment to the Shareholder Agreement. Rai later learned that Oura failed to notify many other shareholders about the amendment.

### C.  OURA'S BOARD REPEATEDLY BLOCKS THE SECONDARY SALE OF RAI'S SHARES

85.  Oura's surreptitious amendment to the Shareholder Agreement gave Oura's Board unchecked authority to block, for any reason, any secondary sale of Oura's shares.

86.  As stated above (*see* ¶¶ 66-67, 77-79) Oura first blocked Rai from selling his Oura shares to Sienna Funds in July 2022. Oura never explained why it refused to permit Rai to sell a small portion of his shares to Sienna Funds, an investment vehicle that specialized in companies like Oura.

87.  In or around April 2023, Rai received unsolicited emails from brokers at Hiive Markets about purchasing $10-$20M of Rai's Oura stock. The brokers from Hiive Markets represented that they were "in touch with buyers who have expressed interest in buying Oura stock."

88.  Rai then began discussions with Hiive about a potential sale of some his Oura shares to a secondary buyer. On May 4, 2023, Rai learned from the broker that the secondary buyer had backed out of the transaction after "speaking with" Oura.

89.  Oura continued refusing to consent to the secondary sale of Rai's shares. As a result, Rai was forced to turn down several potential buyers of his Oura stock. Rai turned down offers he received on or around May 27, 2022, from FVR Partners; on or around August 17, 2022, from Oceanic Partners; on or around August 25, 2022, from a private group of investors; on or around December 1, 2022, from Forge Capital; on or around January 11, 2023, from Setter Capital; on or around May 7, 2024, from Step Ahead Capital; on or around September 12, 2024, from William Blair, and on or around September 12, 2024, from Fnex. Many of these buyers contacted

Oura directly to move forward on a purchase, only to learn that the Company was blocking all secondary sales.

90.     The Board's refusals, combined with the improper amendment to the shareholder agreement, left Rai unable to realize the value of his shares. He had buyers. But—relying on a material contractual change to which Rai had never consented and for which Rai had never received any consideration—Oura thwarted each sale. Oura also refused to provide any explanation or reasoning. That silence left Rai with no recourse. He could not sell his shares, and he did not know why. Rai was trapped.

91.     As Rai has now learned, the ensnarement was part of Defendants' scheme. Relying on the surreptitious amendment to the SHA, the Board was exercising total control over the market for Oura shares. For example, about nine months after Oura first blocked Rai from engaging in any secondary sale of his Oura stock, one of the buyers with whom Rai had discussed selling his shares, Rain Tamm, purchased stock directly from Oura. That purchase revealed that Oura was fine with adding Tamm as a shareholder and no issue with selling shares in that time period. When rejecting Rai's requested sales, therefore, Oura held a more malicious motive.

### D.     DAVID SHUMAN ATTEMPTS TO EXERT ADDITIONAL CONTROL OVER THE PURCHASE OF OURA SHARES

92.     On March 18, 2024, Oura proposed a resolution that would allow Oura's Board (then de facto led by Shuman although Kim held the title of chairperson) to unilaterally: (a) choose the shareholders from whom the Company would repurchase shares; and (b) determine the prices at which those shares would be bought back.

93.     That resolution provided that "The Board of Directors shall decide in each case on the repurchase price within the range of minimum $0.01 USD to maximum $14.87 USD per share," with the authorization effective for 18 months from the date of the shareholders' meeting.

17

94.    Upon information and belief, this proposal was instituted by Shuman.

95.    This proposal was alarming to Rai for multiple reasons.

96.    First, the proposal would allow the Company to eliminate liquidity for some shareholders while granting liquidity to other shareholders—including Shuman and the rest of the board. In other words, the decision-makers could offer a lower share price to other shareholders and a higher share price to themselves.

97.    Second, Rai had learned that Shuman had already engaged in unscrupulous but profitable self-dealing. As Rai discovered in or around March 2023, Shuman was party to a secret agreement with Bedford Ridge Capital ("Bedford"), which had made a significant investment in Oura's Series C financing in 2021 while Rai was still CEO. The secret agreement entitled Shuman to be compensated with a carried-interest allocation equal to 50% of the gain on Bedford's investment in Oura (the "Incentive Agreement"). At the time of the Series C financing, Shuman had advocated aggressively for Oura's Board to approve Bedford's investment over proposed investments from several other prominent candidates. That Incentive Agreement was never disclosed to Rai (Oura's then-CEO) or to Oura's Board of Directors. Rai learned of the agreement only after departing the Company.

98.    Upon information and belief, Shuman also concealed the existence of the Incentive Agreement from other shareholders who participated in the Series C funding round.

99.    As a result, Rai was concerned that the March 2024 proposed amendment would allow Shuman to engage in further self-dealing. The proposal gave the Board unilateral authority to choose the shareholders from whom Oura would repurchase shares and the sales price.

100.    Several large shareholders contacted Rai to raise concerns about the authorization. Those shareholders represented that they would approve the authorization only if the repurchase

18

process followed SEC tender offer rules. Those rules would have required shareholders to be informed about any potential sale of Oura stock and would have permitted them to participate equally on a pro rata basis.

101.    Many of Oura's largest shareholders, including Bedford, pledged to vote against the measure.

102.    Oura pulled the repurchase agenda item before the March 2024 meeting. Upon information and belief, Oura pulled the measure because they feared it would be voted down by shareholders. During that meeting, Eurie Kim assured shareholders that the Company would always follow SEC tender rules when buying back stock from shareholders. That statement was false.

103.    As the repurchase agenda item had failed, the ability of Oura's Board to repurchase shares from shareholders was governed by the authorization approved at Oura's Annual General Meeting on March 22, 2023. That authorization was set to expire on September 22, 2024.

104.    Shuman and the Board, nonetheless, retained the approval rights for all sales, meaning they still had full control over the shares owned by Rai and the Company's other shareholders. But they only had until September 22, 2024 to exercise that control.

105.    Meanwhile, months passed with Rai unable to realize the gains of his Oura stock.

E.    **JUST WEEKS BEFORE ANNOUNCING A MASSIVE SERIES D FUNDING ROUND, OURA SOLICITS RAI TO SELL HIS SHARES THROUGH A BROKER**

106.    At all relevant times, Defendants Shuman and Kim (the "Director Defendants") served as directors of Oura. Because of those roles, they owed fiduciary duties of loyalty and care to the Company and its stockholders, including Rai.

107.    Those duties required the Director Defendants to act in good faith and in the best interests of the Company and its stockholders. The Director Defendants also had the duty to refrain

19

from using their corporate power, superior access to information, or control over corporate processes to disadvantage a stockholder in a self-interested transaction.

108.    When the Company or its fiduciaries solicited, negotiated, or executed a repurchase of a stockholders' shares, the Director Defendants' fiduciary obligations included a duty of candor. When they chose to speak—and when they structured and approved a Company-driven transaction that depended on the stockholder's informed consent—the Director Defendants were duty-bound to disclose material facts within their control.

109.    The Director Defendants breached those duties when—shortly before a profitable funding round was announced—Oura, acting through its Board of Directors, induced Rai to sell his shares at less than half their true value.

110.    The final phase of the scheme began on or around July 26, 2024, when Jason Nelford of Hiive Markets sent an unsolicited email to Rai claiming that Nelford had an approved buyer for a secondary sale of Oura stock. Hiive was the same brokerage firm that had reached out to Rai about buying his stock, only to be blocked by the Company.

111.    Rai and Nelford discussed the valuation of the shares. Rai, in an email sent to Nelford on July 26, 2024, expressed his belief that Oura was valued at $1.5 billion based on his understanding of the Company's 2024 revenues.

112.    Nelford, however, in a response that same day, represented that the "buyer" would not "get up that much"—meaning purchase the shares at a $1.5 billion valuation—but would "[m]aybe buy a[t] [a] slight premium to $1b."

113.    Nelford's statement was misleading because, as Nelford knew and as later revealed to Rai, the "buyer" was the Company itself.

20

114.    Nelford did not disclose to Rai that the Company would soon announce a major Series D financing round at a valuation of more than $5 billion. This material omission rendered Nelford's statement misleading because it gave Rai the false impression that the Board (which owed Rai fiduciary duties) had no material information pointing to a (far) higher valuation.

115.    Two weeks later, on August 12, 2024, Nelford wrote to Rai, "I have been going back and forth with the potential buyer and have got them to $1.2b. I think there is genuine interest at this level and I think there is a good chance we get $10-20m done. I will keep you posted in the coming days." This statement, which must have come from the Board of Directors because only the Board could approve a stock buyback, was also misleading for the same reasons articulated above. At that time, the Board was exploring a Series D that would significantly increase Oura's valuation. By withholding that information from Rai, a major shareholder, the Board breached its fiduciary duties.

116.    Nelford required Rai to agree to extend the term of a listing fee agreement, which Rai and Hiive had signed in 2023, before revealing the buyer's identity.

117.    On or about August 14 and 15, 2024, Rai agreed and then learned that the "approved buyer" was Oura. In other words, Oura had been the direct source of Nelford's representations to Rai. Nelford acknowledged that this arrangement was unusual given the "historical restrictiveness of the company." But Nelford vouched for the good faith of Oura's CFO (Brecker) and emphasized that he had previously worked with Becker.

118.    Rai relied on statements from Oura's Directors and Officers, as relayed through Nelford. Nelford's statements were made at the direction of Oura. Oura retained ultimate authority over the content of Nelford's statements and the way those statements were communicated.

21

119. Relying upon Nelford's representations, Rai took steps to move forward with a sale. In a series of phone calls in the ensuing weeks, therefore, Nelford relayed information from Brecker to Rai about the transaction.

120. For example, on August 26, 2024, Rai asked Nelford to confirm "the fully diluted share count as of today" to "calculate the share price." The next day, Nelford represented to Rai that Brecker confirmed that 204,653,465 shares were outstanding. Meanwhile, the price offered by Oura had increased to a $1.5b valuation.

121. Nelford assured Rai that Hiive Markets was the only broker working on repurchasing Oura shares. Nelford also represented that Hiive had "selectively reached out to several groups" of Oura shareholders.

122. Rai's plan was to sell a small portion of his holdings in Oura at a discounted price. In fact, on August 28, 2024, Nelford emailed Rai, "Harpreet, just checking in here – are we OK to move forward on the $1m at a $1.5b valuation?" This statement too was misleading because the Board of Directors, acting through Nelford, failed to tell Rai that a major investment (at a far higher valuation) was being negotiated.

123. On August 30, 2024, Rai—relying on Oura's representations—sent Nelford a draft repurchase agreement by which Rai agreed to sell to Oura only 32,678 shares at $7.33 for a total sale amount of $239,550. The $1.5 billion valuation was not sufficient inducement to Rai to sell more than a small portion of his holdings back to Oura.

124. However, this small share buyback was insufficient for Oura. As Oura later revealed at the shareholder meeting to announce the Series D on October 31, 2024, the share buyback allowed the Series D share issuance to be non-dilutive for existing shareholders, which

22

was a major benefit as the existing shareholders effectively received an enhanced valuation for their shares for no additional consideration.

125. Those existing shareholders included Defendants David Shuman, Eurie Kim, and, upon information and belief, Sean Brecker.

126. But to induce further sales of shares back to the Company (thus allowing the Series D issuance to be non-dilutive), a higher valuation would need to be offered.

127. On September 4, 2024, Nelford responded that Hiive was "in touch with multiple other potential sellers (likely $20M+ in size) who have indicated interest at $2b," a significant increase over the $1.5 billion valuation currently on the table.

128. Nelford also asked Rai whether Rai knew any other shareholders who wanted to sell their Oura stock.

129. Rai then introduced Nelford to at least seven other shareholders who were interested in the possibility of a sale that would not be blocked by Oura's Board.

**F.   OURA INDUCES RAI TO SELL HIS SHARES AND FORFEIT HIS VOTING RIGHTS**

130. On September 5, 2024, Nelford asked Rai for a call, representing that he had a "positive update." During that call, Nelford represented that Oura had agreed to purchase Rai's shares at a $2 billion valuation.

131. In response, Rai asked Nelford several specific questions that were material to his decision whether to proceed with selling his shares of Oura.

132. Rai asked whether Oura was undergoing a new round of financing, and if so, whether Oura could provide details about the investor and financing of the Company, including Oura's valuation.

133. Rai also asked Nelford who would be purchasing the shares that Oura was buying back from shareholders, and whether those shares would be obtained by a "strategic" investor in

Oura—an investor who contributes capital primarily to advance a business strategy, rather than to simply earn a financial return.

134. Rai also asked Nelford whether the buyer was a United States fund or an international fund.

135. Rai asked these questions for specific reasons. Investment rounds led by strategic or external investors are strong indicators of a company's potential. Investment rounds led by existing investors tend to be smaller in scale and send a weaker message about company performance. Rai knew, for example, that Oura's prior round of investment, the Series C1 round, was led by an existing investor who invested less than \$10M. An external investment in Oura would indicate a perception of strength by new investors and was more likely to influence Oura's share price over time.

136. As a Major Shareholder, Rai was entitled to obtain this information from Oura upon request, as provided by the March 2022 Shareholder Agreement. Section 4 of that agreement entitled Major Shareholders like Rai to "obtain information relating to the Company … from the Company and the Company's auditor and other professional advisers." Section 4 also gave Rai "the right, by giving reasonable prior written notice, at any time during the Company's office hours to examine the Company's accounts, records, administration and economic position regarding any specific matters." Oura, in turn, was required to "make available personnel to reasonably assist in the examination of the documents, records and material."[3]

137. Nelford asked Brecker to answer Rai's questions on behalf of Oura.

---

[3] Rai's status as a Major Shareholder also entitled him to receive unaudited financial reports on a quarterly basis, and audited financial statements on an annual basis. Oura did not comply with those requirements, either, after the Company terminated Rai's position without cause.

138.  Brecker subsequently responded to Nelford. In a September 4, 2024 email Nelford stated that "Sean just got back to me." According to Nelford, Brecker had represented that Oura "can't share valuation information, but the buyer is an existing US-based investor (non-strategic) looking to increase their position size."

139.  This representation was false.

140.  At the time Brecker made that representation, Oura had agreed to a strategic partnership and investment with Dexcom—an investment that was priced at $5.5 billion. Dexcom had not previously invested in Oura. As such, and directly contrary to the representations made to Rai by Nelford and Brecker, Dexcom was not an "existing … investor … looking to increase their position size." Rather, Dexcom had agreed to make a significant financial investment in Oura, which would materially increase the Company's valuation.

141.  The investment from Dexcom was part of Oura's upcoming and undisclosed "Series D" financing round. Series D funding rounds are typically used by established companies with proven business models that are looking to fuel growth in preparation for an Initial Public Offering.

142.  Upon information and belief, Shuman instructed Brecker, either directly or via CEO Tom Hale, to misrepresent the identity and purpose of the purported "buyers" and conceal the existence of the Series D funding from Rai (and from other shareholders solicited by to sell their shares).

143.  Concealing the upcoming Series D investment benefitted Oura's Board because it allowed the Company to repurchase shares from stockholders at artificially low prices. Shuman knew that, if the shareholders were aware of the true nature and extent of the Series D financing, the shareholders would either demand higher prices for their shares or wait to sell until the gains

25

from the investment were realized. But Oura needed to buy back sufficient shares to ensure that the Series D share issuance was non-dilutive to existing shareholders like Shuman (and Kim and Brecker).

144. Naturally, Rai tried to extract the highest possible price for his shares based on the information provided to him. Rai relied on Oura's representations about its finances, including its representations about its investors, to determine whether to sell his Oura shares and at what price. Indeed, Oura had a duty to provide truthful information to its shareholders, including Rai.

145. On September 9, 2024, Nelford represented that he had spoken with Brecker and that "there is no flexibility above $2b." Nelford was referring to the valuation of Oura on which the price per share would be calculated.

146. On September 9, 2024, Rai, through counsel, requested from Oura's general counsel, Avonte Campinha-Bacote, Oura's capitalization table. The reason Rai's attorney made this request was set forth in the email—"Given that the share price is based upon an understanding of the valuation of the Company, we'd like to be able to confirm the math."

147. That same day, in response, Brecker provided Rai and his counsel with a capitalization table that purported to show the total of shares authorized, shares issued and outstanding, fully diluted shares, fully diluted ownership, and cash raised.

148. Brecker failed to disclose that Oura's upcoming financing round would raise $200 million, with more than $75 million coming from Dexcom. Brecker never disclosed that Oura had secured Series D financing.

149. Oura's failure to disclose the Series D financing—especially after Rai explicitly asked whether Oura was undergoing a new round of financing led by a strategic investor—made

26

its statements about Oura's valuation, capitalization, and investment strategy materially misleading.

150.    Rai relied on these representations from Brecker and Nelford to determine whether the $2 billion valuation was a fair price, or whether he should hold onto his shares for the longer term and decline to sell at that time.

151.    After receiving this capitalization table, and based on Oura's prior misrepresentations, Rai expressed agreement to sell additional shares back to Oura—in total, 716,479 shares at a price of $9.77 per share (a transaction totaling approximately $7 million).

152.    Brecker and Oura benefitted from these misrepresentations and omissions because they induced Rai to sell his shares back to Oura before the Company publicly announced the Series D financing, which would have significantly increased the price of Oura's shares. These misrepresentations and omissions—in the context of Oura's scheme to exercise total control over the secondary sale of shares and the information about the value of those shares—allowed Oura to purchase Rai's shares at a significant discount compared to their true value.

153.    At this time (approximately September 10, 2024), Oura, in addition to sending Rai a draft repurchase agreement, also sent Rai a voting rights agreement and irrevocable proxy, which assigned Rai's share's voting rights to the purchaser (Oura) before the close of the sale. Such an agreement, unusual in its scope, was beneficial to Oura as it would allow Oura to vote these shares in favor of the still-concealed upcoming Series D financing round.

154.    On September 11, 2024, Rai's counsel sent an executed version of the $7 million stock repurchase agreement to Campinha-Bacote (General Counsel) and Sean Brecker (the CFO). Rai executed the agreement from his place of residence in Meredith, New Hampshire. That same day, Campinha-Bacote returned a fully executed version of the document, signed by the

27

Company's CEO, to Rai's counsel. All that awaited the closing of the $7 million deal was a wire from Oura, which would trigger the transfer of the stock from Rai to Oura.

### G.   OURA INDUCES RAI TO SELL 100% OF HIS HOLDINGS IN OURA

155.   However, despite already signing a share repurchase agreement, Oura and Rai continued discussions whereby Oura induced Rai to sell back virtually all his remaining stock to Oura.

156.   On September 19, 2024, Nelford emailed Rai's counsel and Oura's counsel to "work out the details" of a new purchase agreement between Rai and Oura.

157.   This second transaction, negotiated in and around September 19-20, 2024, between Rai's counsel and Oura (represented by Latham and Watkins), included two separate sales of shares back to Oura. The first sale was the $7 million sale at $9.77/share as already agreed-to. This was to close in September 2024. The second sale, which was to close in January 2025, was for the sale of 2.5 million shares at $10.26/share, generating proceeds of $26.8 million.

158.   In addition, Oura insisted that the sales of shares were subject to Rai signing a "voting proxy" so that Oura could vote his shares between then (September 2024) and when the second sale would close in January 2025. This term was "a non-negotiable point *for the Board*," as relayed in a September 20, 2024 email, and they demanded that Rai "agree to not physically (or virtually) join any shareholder meetings that occur between the signing & closing of the transaction."

159.   The eradication of Rai's voting rights was a key component of Defendants' scheme. Oura did not want to risk Rai exercising his voting power—whether to obstruct the approvals needed to close the Series D financing or to interfere with the closing of his sale of Oura shares— in the months between the revelation of Oura's deception and the closing of the transaction. Oura

28

also did not want Rai to be able to attend any shareholder meetings, where he would be able to educate other shareholders about the Company's scheme.

160.   On September 20, 2024 at 5:29 p.m., Rai's lawyer emailed counsel for Oura, Latham and Watkins partner Jana Kovich, with a number of additional questions material to the transaction: 1) whether the Company would need to hold a shareholder meeting to approve repurchases in "Q4"; 2) whether Oura would allow Rai to rescind the agreement to sell (which would not close until January 2025) "in the event that the company entertains a fundamental change of control transaction, which was necessitated out of the delayed funding construct"; 3) whether "the Company expect[s] to enter into any such negotiations in Q4"; and 4) why the Company needed until January 10, 2025 to fund the repurchase."

161.   Just two hours later, on September 20, 2024 at 7:26 p.m., Oura's counsel at Latham wrote back saying that Oura was not "inclined to negotiate further." Counsel explained that:

> For further context, the market price for recent secondary sales has been $9.77 (as we understand Harpreet is aware). To solidify a deal to cash Harpreet out of his full position, as well as defer the funding date, the Oura team was amenable to a price lift to $10.26 for the $26M "second tranche" of funding … This price reflects a negotiated concession by Oura, and **while Oura has no imminent plans for further repurchases or M&A discussions, they are not interested in further concessions that would hamper their ability to make operational decisions**."

162.   This statement by Oura's counsel at Latham, which omitted any mention of the imminent Series D funding round that drove Oura's decision to repurchase Rai's shares, was both false and misleading by virtue of this material omission.

163.   In addition, the statement affirmatively represented that Oura would not offer Rai "price protection" or rescission because it would "hamper their ability to make operational decisions." This was not true—Oura was in the final stages of a major new funding round that would drastically increase the value of Oura's shares.

164. Oura, through Brecker and Campinha-Bacote, also represented to Rai that the authorization for the share repurchase would expire on September 22, 2024, and that they did not know whether the Board would approve another repurchase.

165. Relying on these representations, Rai decided to sell his 2,552,316 additional shares—the balance of his shares in the Company—back to Oura for a price of $10.26 per share.

166. Rai executed the agreements to sell his shares and forfeit his voting rights from his home in Meredith, New Hampshire.

167. This price was based on Rai's understanding—which was, in turn, based on Oura's representations—that the Company was valued at approximately $2 billion.

168. Oura agreed that the transaction would close on or before January 10, 2025.

169. The magnitude of Oura's Series D financing round imposed on Oura 's Directors and Officers, including Brecker, Kim, and Shuman, a fiduciary duty to disclose those transactions to Rai, in the context of an offer to repurchase Rai's stock, particularly where, as here, Rai had requested that information.

170. But for Oura's misrepresentations and omissions, Rai would not have sold his shares or forfeited his voting rights in September 2024. Rai would have held onto his shares and his voting rights to capture the significant increase in value in Oura's stock that would result from the strategic investment.

**H.    ON SEPTEMBER 22, 2024 RAI EXECUTES BOTH A "VOTING RIGHTS AGREEMENT" AND A "SHARE REPURCHASE AGREEMENT"**

171. As a condition of Rai's stock repurchase, Oura required Rai to execute two documents, a "Voting Rights Agreement" (the "VRA") and a Stock Repurchase Agreement (the "SRA"). The SRA is attached as Exhibit 2.

172.     The SRA and the VRA were both prepared by Oura's outside counsel at Latham & Watkins LLP.

173.     The SRA stated that "As of the date hereof, [Rai] has delivered to [Oura] a duly executed voting rights agreement, in a form acceptable to the Company, with respect to all Purchased Shares." Ex. 2, ¶ 1.2(b).

174.     The SRA provided that the repurchase of Rai's shares "shall take place no earlier than January 1, 2025 and no later than January 10, 2025." *Id*. ¶ 1.2(a). However, Rai could not terminate the SRA prior to closing absent certain conditions, such as the sale of the company.

175.     The SRA contained a "seller release" clause that purported to release all past, present, or future claims, except for those claims that are either legally unwaivable or arise under the SRA or the VRA. *Id.* ¶ 6.1. The SRA also required Rai to acknowledge, in a "seller investigation" clause, that Oura may possess material information not known to Rai, that Oura's shares may significantly increase in value in the future, and that Oura shall not have any liability to Rai with respect to the non-disclosure of any information about Oura's financial condition or the value of its shares. *Id.* ¶ 2.5.

176.     These clauses are void to the extent that they purport to waive either liability for intentional harm or compliance with any provision of the federal or New Hampshire securities laws.

177.     The SRA also included a dispute resolution provision, which provides that "Any dispute, controversy or claim arising out of or in connection with this Agreement or the transactions contemplated herein, or the breach, termination or validity thereof shall be finally and exclusively settled by arbitration in accordance with the Arbitration Rules of the Finland Chamber of Commerce." *Id.* ¶ 8.12.

31

178. Defendants misled Rai into agreeing to each of these unfavorable clauses. Rai asked Defendants specific questions about Oura's finances. The information Rai requested was material to his decision to sell his shares and execute the agreements that Defendants drafted. Defendants provided him direct answers to those questions. Those answers have proved to be false or misleading. Rai relied on Defendants' answers, and on an expectation that Defendants would abide by their fiduciary duties to him, when he agreed to the exculpatory clauses in the agreement. Rai would never have agreed to release Oura from any liability or to agree to arbitration any disputes in Finland had he known that Defendants had lied to him. Moreover, arbitration in Finland no longer makes sense because Oura has re-domiciled to the United States.

179. Defendants procured Rai's agreement to sell his shares, and his agreement to execute each of these clauses, by fraud.

180. The SRA further incorporated the terms of the VRA—the "Voting Rights Agreement shall remain in full force and effect as of the Closing, and [Rai] shall not have materially violated or otherwise materially breached such Voting Rights Agreement." *Id*. ¶ 4.2.

181. The VRA, in turn, provided the Company, and specifically the Board of Directors, more control over any future shareholder or board proposals, even before the close of the share repurchase.

182. Upon information and belief, Oura required shareholders to execute the VRA so that the Company would have sufficient votes to authorize the issuance of Series D shares, to authorize further share buy-backs, and to control the prices of such shares.

183. The execution of the VRA was an inducement and a condition precedent to the repurchase. The VRA expressly stated that the "agreement regarding the voting of the Shares and

32

exercise of [Rai's] corporate powers" was "a condition to the [September 22, 2024] Repurchase Agreement." Ex. 1 at 2 ¶ B.

184. In the VRA, Rai agreed that "on any and all occasions where shareholders are entitled to exercise or abstain from exercising their powers in [Oura]," that his "the Shares shall be voted and all other actions available to the Investor shall be taken in accordance with proposals of the board of directors of the Company." *Id*. at 2 ¶ C.

185. The VRA made clear that "in the event of any ambiguity or discrepancy between the provisions of the" SRA and the VRA, "the obligations of the Investor set out in this Agreement [the VRA] shall prevail." *Id*. at ¶ 2(b). That provision was in a section entitled "Order of Priority."

186. The VRA required Rai to "irrevocably" designate Oura's CEO, Tom Hale, as his "proxy," with "full irrevocable power and authority" and take any action with respect to Rai's shares. *Id*. ¶ 4(c)(i).

187. The VRA included a power of attorney that appointed Hale "to act as [Rai's] true and lawful representative and to vote on [his] behalf at all future General Meetings of Shareholders of the Company where [he] would in accordance with Finnish Companies Act be entitled to vote, and to do or undertake any act, measure or thing necessary or appropriate in such context." *Id*. at 12.

188. The VRA was scheduled to terminate upon Rai "no longer holding any Shares in the Company." *Id*. ¶ 8(a). In other words, the VRA ensured that Rai would not be able to exercise his voting rights in the period between agreeing to the repurchase and the closing of his repurchase.

189. The VRA also provided that the VRA "and the transactions contemplated hereby, and all disputes between the parties under or related to the Agreement or the facts and circumstances leading to its execution, whether in contract, tort or otherwise, shall be governed by

33

and construed in accordance with the laws of the State of Delaware, without regard to the application of Delaware principles of conflicts of laws." *Id*. ¶ 9.10(a).

190.    The VRA further provided that any unresolved controversy or claim arising out the Agreement should be submitted to binding arbitration in Delaware, administered by JAMS. *Id*. ¶ 9.10(b).

191.    However, the VRA made clear that this arbitration provision does not apply to suits for equitable relief—"Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Delaware or any court of the State of Delaware having subject matter jurisdiction." *Id*. ¶ 9.10(b).

192.    The SRA's dispute resolution provision, which calls for arbitration in Finland, conflicts with the corresponding provision in the VRA. The VRA dispute resolution provision therefore controls, under the order of priority provision of the VRA.

193.    Rai obtained a total of $32,688,960.56 from his sale of Oura stock, the majority of which was sent to him in January 2025.

## I.    OURA'S GENERAL COUNSEL WARNS OTHER FORMER OURA EMPLOYEES NOT TO SELL SHARES

194.    Rai later learned that, during this same time period, Oura was soliciting sales from other shareholders using the same broker, at various different prices – some for $6 per share, others at $7 or $9 per share. Upon information and belief, Oura bought back approximately $50 million of stock from shareholders during this time period before the Series D financing became public.

195.    Upon information and belief, in or around August or September 2024, while Oura was actively soliciting shareholders to sell their Oura stock to the Company, another former Oura employee, David Goto, separately contacted Campinha-Bacote. The same broker had contacted Goto to solicit a sale of his shares, and Goto called Campinha-Bacote to inquire about the broker.

196.    Campinha-Bacote advised Goto not to sell his shares.

197.    Upon information and belief, Campinha-Bacote advised Goto not to sell his shares in the Fall of 2024 because Campinha-Bacote knew that the prices of Oura's shares would soon significantly increase, thus benefitting the (favored) former employee, thereby demonstrating Oura's knowledge that any shareholder looking to sell his or her stock would benefit from waiting until after the Series D financing (that Oura concealed).

198.    Upon information and belief, the conversation with Campinha-Bacote led Goto to not sell his shares in the fall of 2024.

199.    Defendants withheld this information from Rai for the purpose of inducing him to sell his shares and forfeit his voting rights before he became aware of the new financing.

**J.      OURA ANNOUNCES A NEW ROUND OF FINANCING WORTH $5.5 BILLION, BRINGING SHARE PRICES TO $25 PER SHARE**

200.    On October 24, 2024, CEO Tom Hale sent an email to all existing shareholders announcing that an "Extraordinary General Meeting" of the shareholders would take place on October 31, 2024 at 8:30 a.m. Pacific Time (5:30 p.m. in Finland).

201.    That extraordinary general meeting of the shareholders was held on October 31, 2024.

202.    At that meeting, Oura's Board of Directors proposed to amend the Company's Articles of Association to create a new "Series D" preferred class of shares. This amendment was necessary to implement the Series D round of funding.

203.    Shareholders then approved the issuance of 7,785,129 new Series D shares and the cancellation of over 31,000,000 shares that were previously earmarked as option grants. Rai would have been able to exercise his voting rights over the amendment had he not been induced to forfeit those rights.

204. This was the first time Rai learned that Oura was engaged in a new round of financing. Had he known about the planned financing, Rai would not have sold his shares back to Oura.

205. Rai was not permitted to attend or participate in that shareholder meeting because of the VRA that Oura had required him to sign.

206. During the October 31, 2024, meeting, Oura told shareholders that although the price per share of the Series D shares was still being determined, it would be "an up round" versus Series C1, meaning that the company's valuation would be higher than $2.55 billion post-money. The Company also explained that with the share repurchases (such as Rai's shares) and the cancellation of authorized stock, the Series D issuance would be net "NON-dilutive to all existing shareholders." In effect, this meant that the Series D financing would not reduce existing holders' ownership percentage; existing stock owners (such as Shuman and Kim) would have more valuable stock without being diluted. This was free money for existing investors.

207. However, it was not free money for Rai. Even though Rai still owned his shares, he had already executed irrevocable (absent certain circumstances not applicable here) agreements that obligated him to sell the shares back to the Company in January 2025 at a price far lower than the Series D funding round valuation.

208. The timing of the meeting announcement and the fact that Oura knew it was an "up round" indicate that the key terms of the financing were settled well before Oura's October 24 announcement.

209. In other words, Oura knew the terms of the financing round when Rai asked about it in August and September 2024, but materially misrepresented the details to Rai to induce him to

36

sell his shares. These misrepresentations guaranteed additional money for Shuman, Kim, Brecker, and other existing major investors.

210. On or about November 20, 2024—about eight weeks after Rai executed the SPA and the VRA, but before the transaction closed—Oura publicly announced a new strategic partnership with Dexcom, Inc. ("Dexcom").

211. Dexcom is an American healthcare company that specializes in glucose monitoring systems to help individuals with diabetes manage their blood glucose levels.

212. According to Oura's announcement, the partnership with Dexcom would allow Oura rings to collect glucose data, thereby providing "a more complete picture of overall health" for users.

213. Given the complexity of the changes associated with this partnership, it was clear that the partnership between Oura and Dexcom had been in the works for at least several months, if not longer.

214. Accordingly, Defendants knew that the statements that they made to Rai in September 2024 were false or misleading.

215. The announcement also revealed that Dexcom would be making a $75 million "strategic investment" into Oura's Series D funding and noted that Oura was "now valued at more than $5 billion."

216. Oura had also raised approximately $125 million from Fidelity, another new investor, during the Series D round of financing.

217. In total, after the Series D financing round—and just weeks after soliciting and then inducing Rai to sell his shares back to the company at $10 per share—Oura's share price increased to approximately $25 per share.

37

218. Upon information and belief, after announcing its strategic partnership with Dexcom, Oura began using the same broker, Hiive, to repurchase shares from shareholders at a price of $18 per share.

219. Altogether, following that announcement, Oura repurchased approximately $157 million worth of shares at an average price of approximately $17.46 per share.

### K.   OURA ANNOUNCES THAT IT WILL CONDUCT A TENDER, PERMITTING ALL SHAREHOLDERS TO SELL AT $18 PER SHARE

220. In or around March 2025, Oura announced to investors that it would conduct a tender, where all shareholders could sell their shares at $17.71 per share. This was nearly double the price that Rai had sold his shares back to Oura at just three months earlier. Rai's nearly 3.3 million shares would have been valued at $58 million at that point.

221. The tender would be open for approximately thirty days, ending on June 20, 2025.

222. Oura subsequently repurchased approximately $200 million in shares across all class of stock. There was demand by investors to re-sell approximately $1 billion in shares back to the Company in the tender offer.

223. Because of the demand to sell shares back to the Company in the tender offer, interested shareholders could sell no more than approximately 20% of their total position. This means that had Rai not sold his shares back to Oura in September 2024, he would have continued, even after the tender, to hold more than 80% of his shares, which would be valued at $65 million.

224. On or about April 23, 2025, Oura held an extraordinary shareholders' meeting in which shareholders approved the Board of Directors to repurchase up to 20,000,000 shares, constituting up to 10% of all shares in the Company, at a price not to exceed $25.69.

38

**L.    SOON AFTER, OURA ANNOUNCES ANOTHER NEW ROUND OF FINANCING, BRINGING SHARE PRICES TO $54 PER SHARE**

225.    Approximately twelve weeks later, on or about September 2025, Oura announced a new round of financing and raised approximately $1 billion.

226.    Per the announcement, the Company was now worth approximately $11 billion, with share prices at approximately $54 per share.

227.    The difference in the value of Rai's shares when Rai sold (at $10 per share, in September 2024) compared to September 2025 ($54 per share) was approximately $142 million.

228.    On November 3, 2025, Oura held an extraordinary general meeting of shareholders, during which shareholders authorized the Board of Directors to repurchase up to 30,000,000 shares, corresponding to approximately 15% of outstanding shares, at a price not to exceed $75 per share.

229.    Between December 2025 and February 2026, Oura repurchased shares from seven different Oura shareholders at seven different prices. Although the transacted shares were all of the same type, the prices offered by Oura ranged from $17.71 to $40.18.

230.    On December 19, 2025, the online brokerage Robinhood purchased $25 million worth of Oura shares at a purchase price of $53.57 per share.[4]

231.    Oura's conduct reveals a consistent pattern. The Company will first reach a deal for new financing. The Company will *then* withhold that material information from shareholders and then buy back shares from those misled shareholders at artificially low prices (*i.e.,* below the new financing share price). Then the Company will announce that new round of financing, while the insiders profit from having misled the selling shareholders.

---

[4] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0002085091/000162828026008313/ck0002085091-20260217.htm

232. David Shuman had tried a similar ploy before the Series C financing. After the Company had settled on a share price for a new investment from Bedford, Shuman had wanted to try to buy out Oura's founding members at a lower price. Shuman had been undeterred by concerns that this ploy would have been unethical, if not illegal. Shuman had instructed Chief Operating Officer Michael Chapp to call the founders and negotiate the deal. The founders, likely sensing that something was awry, had declined Shuman's offer. The founders waited to sell their shares until the post-Series C tender, in which they were able to realize the gains of the new financing.

233. Oura's conduct inverts the industry standard. The typical practice is for a company to announce a new round of financing and *then* conduct a tender of shares. This sequence allows shareholders to reap the benefits of the new financing. Indeed, a startup cannot raise capital from investors if those investors will not reap the benefits if the company succeeds and grows in value. In other words, shareholders are meant to "share" in the increased value of a company; otherwise, it is pointless to invest in the company.

234. During Rai's tenure as CEO, Oura *did* follow industry practice. In March 2021, the Company conducted a tender offer *after* announcing the Series C financing round. Shareholders were also able to sell their shares on the secondary market after the Company announced the Series B financing round.

235. Now, however, Oura conducts business in the opposite way to benefit a select group of insiders, like the individual Defendants, to the detriment of the average shareholder.

### M.    IN EARLY 2026, OURA REDOMICILES TO THE UNITED STATES

236. On January 28, 2026, Oura Inc. was registered as a Delaware corporation.

237. Shortly thereafter, Oura initiated a process to redomicile Oura Oy, the Finnish parent company, to Delaware, United States.

238. Under the operative shareholder agreement, this re-domiciliation process required the consent of Oura Oy shareholders. Upon information and belief, securing the necessary votes for the re-domiciliation process was one of the motivating factors behind Oura's requirement that selling shareholders like Rai forfeit their voting rights.

239. Pursuant to the re-domiciliation, all shareholders of Oura Oy contributed their shares of Oura Oy to the newly formed Delaware corporation Oura Inc. in exchange for equivalent shares in Oura Inc.

240. The re-domiciliation process made Oura Inc. the parent company of Oura and the success company to Oura Oy, effective on or about March 31, 2026.

241. Pursuant to Section 8.3 of the SPA, the terms and conditions of the SPA are binding on Oura Inc., as the successor entity to Oura Oy.

## V.    CLAIMS ASSERTED IN THIS COMPLAINT

242. As set forth in more detail below, Plaintiff asserts two separate sets of claims.

243. Counts One, Two, Three, and Four assert fraud-based claims under the common law and under §§ 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

244. Plaintiff's fraud claims arise out of a fraudulent or deliberately reckless course of conduct in which Defendants knew or recklessly disregarded: (i) that the statements and omissions they made, as alleged herein, were materially false and misleading; (ii) that their actions would conceal the market price of Oura's shares from Oura's shareholders, including Plaintiff; and (iii) that their statements, omissions, and course of conduct would deceive Plaintiff into selling his entire stake of Oura stock at artificially deflated prices and forfeiting the voting rights to those shares.

245. Counts Five, Six, Seven, and Eight assert negligence or strict liability claims under the common law and under the New Hampshire Uniform Securities Act. None of these counts is based on any allegation of deliberate or intentional misconduct, and Plaintiff expressly disclaims any reference to, or reliance on, fraud allegations for such claims.

246. Each of the Defendants named in Counts Five, Six, Seven, and Eight made materially false and misleading statements and omissions in connection with Plaintiff's sale of Oura stock and forfeiture of his voting rights. By making these false and misleading statements, Defendants breached their fiduciary duties and violated New Hampshire law.

### A. DEFENDANTS' FRAUDULENT SCHEME TO CONTROL THE MARKET FOR OURA SHARES

247. Count Two, which asserts scheme liability under Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) promulgated thereunder, arises from the following course of conduct.

248. On March 18, 2022, Defendants executed an Amended and Restated Shareholders Agreement, which reduced the threshold necessary to amend the agreement from 75% to 60% of outstanding votes. This change afforded board members like Kim and Shuman increased influence over shareholder affairs.

249. Effective May 12, 2022, less than two months after Oura shareholders had executed the amended shareholders agreement, Oura secretly changed the rules governing secondary sales of Oura stock. On that date, Oura's Board of Directors—at Shuman's behest—pushed through an amendment to the shareholders agreement that prohibited shareholders like Plaintiff from selling their Oura stock on the secondary market and gave the Board complete control over the sale of Oura's shares.

250. The tactics that Oura employed to push through that amendment violated the then-operative Shareholder Agreement. Under that agreement, any amendment that disproportionately impacted the rights of a particular shareholder required the consent of that shareholder. Oura never obtained Rai's consent. And the Amendment disproportionately disadvantaged Rai's rights to sell his shares. The Amendment was therefore invalid.

251. Oura's Board of Directors, led primarily by Shuman, nonetheless exercised the control they had secured for themselves by repeatedly blocking Plaintiff from selling his Oura shares. Meanwhile, the Company continued to conduct transactions on Oura shares, on terms dictated by the Board. Oura sold stock to at least one buyer who had reached a deal with Rai that the Board rejected.

252. Each of those actions was taken to give Board complete control over the sales of Oura shares, to control the market for Oura shares, and to determine the price at which those shares would be sold.

253. However, the Board's authorization to repurchase shares from Oura stockholders was set to lapse on September 22, 2024. The Board, led by David Shuman, then asked shareholders to authorize the Board to repurchase shares for 18 more months.

254. Upon information and belief, the purpose of this Amendment was to facilitate Oura's ability to buy back shares from existing shareholders before the Series D financing—which had already been agreed to—was announced to the market.

255. When that amendment failed under shareholder pressure, Oura opted for a different strategy—hiring an intermediary to solicit Oura shareholders to quickly sell their shares before the authorization lapsed.

43

256. In or around July 2024, Oura's broker Hiive markets sent unsolicited emails to shareholders, including Plaintiff, claiming that they had approved buyers for secondary sales of Oura stock. The outreach from Hiive was welcome news to shareholders, who were otherwise unable to realize any gains from their Oura stock.

257. The timing of Oura's solicitation was no accident. Oura solicited shareholders to sell their shares in September 2024, before the Company was to announce a Series D financing round that would significantly increase Oura's valuation.

258. Purchasing shares before the public announcement of the Series D financing would allow Oura, and its Board, to buy back shares at significantly lower prices. To keep the prices low, Oura deliberately concealed the fact of that investment from shareholders.

259. Defendants instructed everybody who was negotiating the shareholder buybacks—including Nelford and Brecker—to proactively conceal the existence of the Series D financing. Oura's failure to disclose the Series D financing in their communications to Rai violated the Company's contractual duties to Rai as a Major Shareholder. That status entitled Rai to obtain information relating to Oura and to examine Oura's "economic position."

260. Plaintiff asked targeted questions to Oura for the specific purpose of determining whether Oura was soliciting his shares before announcing a strategic investment that would affect the value of his Oura shares. Enacting the scheme required Oura to make false or misleading statements in response.

261. Oura's Board instructed Nelford, Brecker, Campinha Bacote, and the Company's outside counsel to deliver false and misleading statements to Rai. These statements and omissions came from Oura's Board of Directors because only the Board had the authority to approve a stock buyback. Nelford's own representations made clear that his statements originated with Oura. These

misrepresentations were designed to lead Plaintiff into believing that Oura did not possess any information that pointed to a higher valuation of the Company.

262. Oura's goal was to buy back as many shares as possible from Rai—and from other shareholders—to ensure that the Series D round would be non-dilutive to the remaining shareholders.

263. In the final part of the scheme, Oura induced Rai into forfeiting his voting rights for three months before the transaction closed. Requiring Rai to sign the VRA as a condition of selling his shares ensured that Rai would not interfere with the shareholder action needed to lock in the Series D financing. Requiring Rai to sign the VRA also helped ensure that the Company had the necessary votes to complete the re-domiciliation process.

### B.    ADDITIONAL ALLEGATIONS OF SCIENTER

264. As relevant to Counts One, Two, Three, and Four, Defendants acted with scienter in that they either knew or recklessly disregarded (1) that the statements disseminated to Plaintiff in the name of the Company were materially false and misleading and (2) that the scheme to control the repurchasing of Oura's shares would manipulate the market for those shares and deceive shareholders as to the pricing of such shares, as described more fully below. Each Defendant participated or acquiesced in the issuance of such statements and in the scheme outlined in Section IV.B.

265. As Chairperson and Board Member, respectively, Eurie Kim and David Shuman participated directly in the amendments to the shareholder agreement that gave the Board complete control over the market for Oura shares. Kim directly exercised that control by blocking Plaintiff from selling his shares on July 14, 2022.

45

266.    Exercising control over the market for Oura shares, and the information disseminated by the Company to shareholders, gave Oura's Board Members, including Kim and Shuman, the opportunity to commit fraud.

267.    In July 2024, Oura's Board directed a broker to solicit Plaintiff. The broker represented to Plaintiff that he was "selectively reaching out" to specific Oura shareholders. Oura's Board knew, from Plaintiff's prior attempted sales, that Plaintiff was motivated to sell his shares in Oura.

268.    Defendants' proactive solicitation of selected Oura shareholders two months before the announcement a massive financing event demonstrates their intent to purchase Oura shares at artificially low prices.

269.    All the representations that Nelford made to Plaintiff during that solicitation came directly from Oura—either from CFO Sean Brecker or from the Board of Directors (helmed by Kim and Shuman), because only the Board could authorize a stock repurchase.

270.    The Series D financing, including the strategic partnership with Dexcom, were announced in October 2024. Given the complexity of the changes associated with this partnership, it was clear that the partnership between Oura and Dexcom had been in the works for several months before that. Accordingly, Defendants knew that the statements that they had authorized Nelford to make about Oura's valuations or financing plans were false or misleading when made.

271.    On information and belief, Shuman instructed Brecker to misrepresent and conceal the existence of the Series D funding from Rai (and from other shareholders solicited by Oura to sell their shares). Defendants' plan to repurchase shares before the October 2024 price jump would be ineffectual if Oura's financing plans were disclosed to potential sellers.

46

272. Oura's General Counsel, Avonte Campinha-Bacote, specifically advised a former employee to not sell his shares in the Fall of 2024. The only reason that the General Counsel would give that advice is because he knew that the price of Oura's shares would imminently increase, and that it would not be in the shareholder's best interest to sell before the announcement of the new round. Campinha-Bacote's statements are further evidence that Oura's Directors and Officers were aware of the effect of the Series D financing on the price of Oura stock and were proactively soliciting shareholders to lock in a low price before announcing the financing.

273. Moreover, Shuman had a documented history of manipulation and self-dealing, as evidenced by his undisclosed carry agreement with Series C investor, Bedford Ridge Capital.

274. Defendants had a financial motive to conceal the truth about Oura's valuation from the shareholders that they solicited. Oura benefited from the share buyback because it allowed the issuance of Series D shares—to Dexcom, Fidelity, and others—to be non-dilutive for existing shareholders. As a result, existing shareholders (including Defendants Shuman, Kim, and Brecker) received an enhanced valuation for their shares without giving up any control over the Company.

275. Defendants' "non-negotiable" requirement that Plaintiff (and others) execute an agreement to forfeit his voting rights is further evidence of fraudulent intent. The purpose and effect of the Voting Rights Agreement was to prevent shareholders who had been misled from using their voting power to prevent the issuance of Series D shares, or to otherwise affect the Company's ability to repurchase additional shares.

276. Oura's scheme worked precisely as designed. The Company repurchased significant amounts of shares at low price before the concealed information was revealed to the market, and Oura's share price ultimately rose to $54.

47

### C.    A CONSTRUCTIVE TRUST IS NEEDED TO PRESERVE RAI'S OWNERSHIP OF OURA SHARES

277.    Defendants acquired from Rai's than three million shares in Oura and voting rights associated with those shares, through deceptive conduct, fraud, and breaches of fiduciary duty.

278.    Defendants have been unjustly enriched by obtaining Rai's shares at a suppressed price while concealing a valuation-changing strategic transaction and financing.

279.    Defendants now hold the repurchased shares, and any traceable substitutes, proceeds or benefits derived from those shares, under circumstances that make it inequitable for Defendants to retain them.

280.    Equity therefore requires imposing a constructive trust over the repurchased shares and any proceeds or benefits traceable to those shares, for Rai's benefit, pending rescission and final judgment.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
### Equitable Fraud
### (Against Defendants Ouraring, Oura Oy, Oura Inc., and Sean Brecker)

281.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

282.    Oura, and its directors and officers, owed a fiduciary duty to Plaintiff, a major shareholder of Oura and its former Chief Executive Officer. Oura exercised control over Plaintiff's shares by improperly granting Oura's Board of Directors total discretion with regards to transfers of Oura stock without notice to Rai. Oura also possessed material information that was unavailable to Plaintiff in his capacity as a shareholder, including about the Company's valuation, the Series D round of fundraising, and the prices at which it was purchasing Oura stock from other shareholders. As a shareholder, Plaintiff reposed trust and confidence in Oura, and more specifically in the representations made by Oura's officers and directors.

48

283.     Oura solicited Plaintiff to sell his shares in the Company, weeks before Oura was slated to announce a major round of fundraising and strategic investment. Oura did so to induce Plaintiff to sell his shares at artificially depressed prices and to deny him the gains that would result from the subsequent increase in the Company's valuation.

284.     Oura, through its officer Sean Becker and its agent Jason Nelford, made several false representations of fact to Plaintiff in connection with the Company's offer to purchase his shares in Oura. Oura represented that the buyer of Plaintiff's stock was an existing stockholder looking to increase its position in Oura. Oura further represented that this buyer was a non-strategic investor. These statements were false when made because Oura had already negotiated a strategic investment by Dexcom, who was not an existing stockholder.

285.     Oura also failed to disclose to Plaintiff the Company's strategic investments with Dexcom and Fidelity, and the existence of the Series D fundraising. The Series D financing round was of a sufficient magnitude that Oura owed Plaintiff a duty to disclose it in the context of a private stock sale. Oura was also contractually obligated to disclose the financing to Rai, given his status as a Major Shareholder. Oura's failure to disclose the pending transactions also made its affirmative statements, and the capitalization table it provided to Plaintiff, materially misleading.

286.     Oura made these material misrepresentations and material omissions to induce Plaintiff to sell his Oura stock and to forfeit his voting rights in Oura.

287.     Plaintiff executed the Voting Rights Agreement and Stock Repurchase Agreement and sold 100% of his shares in Oura in reliance on those material misrepresentations and omissions.

288.    Had Plaintiff known about the Series D fundraising, he would not have forfeited his voting rights or sold his Oura shares in September 2024. Plaintiff would have held onto his shares to appreciate the gains from that transaction.

289.    Plaintiff was justified in relying on the representations of Oura's Chief Financial Officer and Oura's broker-agent.

290.    As a result of Defendants' fraud, Plaintiff seeks share rescission to transfer the shares back from Oura to him.

291.    Plaintiff also seeks the imposition of a constructive trust for share rescission, whereby the improperly purchased shares shall be held in trust for Plaintiff pending resolution of this dispute.

**COUNT TWO**
**Scheme Liability: Violation of Section 10(b) of the Exchange Act**
**and Rules 10b-5(a) and (c)**
**(Against All Defendants)**

292.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

293.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege nor prove in this Count that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

294.    Oura purchased securities from Plaintiff on September 22, 2024.

295.    During the relevant period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (a) deceive Oura's shareholders, including Plaintiff; (b) artificially deflate the price of Oura securities; and (c) cause Plaintiff to sell Oura's securities to Oura at artificially deflated prices.

296.    Defendants' fraudulent devices, schemes, and deceptive acts included the surreptitious amendment of the Shareholder Agreement to deny the rights of shareholders to execute secondary sales of Oura's stock, the subsequent blocking of Rai's attempts to sell his shares, the proactive solicitation of Oura stock in the weeks before disclosing an investment with material effect on the Company's valuation, and the concealment of material information from the stockholders who Defendants solicited.

297.    Had Plaintiff known of Defendants' unlawful scheme and unlawful course of conduct, he would not have sold Oura securities at artificially deflated prices in September 2024, nor we would have forfeited his voting rights in Oura.

298.    Defendants employed various instrumentalities of interstate commerce, including email, internet communications, and other wire transfers, to enact this scheme.

299.    All Defendants participated directly in the fraudulent scheme. Brecker delivered the misstatements and omissions to Rai. Board member David Shuman orchestrated the stealth amendment to the shareholder agreement. Eurie Kim blocked Rai's attempted secondary sales. Both Shuman and Kim exercised control over Oura's actions, including by instructing Brecker to conceal the existence of the Series D financing from Rai.

300.    As described above, each Defendant acted with scienter throughout the relevant time period.

301.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff suffered economic loss in connection with his sale of Oura securities.

302.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiff for the injury suffered in connection with his sale of Oura securities.

303.    As an equitable remedy for these violations, Plaintiff seeks rescission of his agreement to sell his shares and to transfer the shares back from Oura to him through the imposition of a constructive trust.

**COUNT THREE**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against All Defendants)**

304.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

305.    In connection with Rai's sale of securities, Oura, through Sean Brecker and Jason Nelford, made several untrue statements of fact. These untrue statements included: (a) that the buyer of Plaintiff's Oura stock was an existing investor in Oura, and (b) that the buyer of Plaintiff's Oura stock was not a "strategic investor."

306.    Through Brecker and Nelford, Oura also omitted several facts which made its statements misleading in light of the circumstances they were made. Specifically, Oura failed to disclose that (a) Oura had reached an agreement with Dexcom for a significant strategic investment and (b) that this strategic investment would significantly increase the valuation of the company. These omitted facts made misleading Oura's statements about the nature of the investment in Oura and the capitalization table that Oura provided Plaintiff.

307.    Brecker had the apparent authority to act on behalf of Oura as its Chief Financial Officer. Nelford had the apparent authority to act on behalf of Oura as its broker and agent.

308.    Each of these facts was material to Plaintiff's decision to forfeit his voting rights and sell his Oura shares on September 22, 2024. Had Plaintiff known that Oura had agreed to a sizeable strategic investment from a new investor, he would not have sold his shares at that time.

52

Plaintiff would have held onto his shares to realize the gains from that strategic investment. Any reasonable investor would have viewed the false or omitted information as significantly altering the total mix of information available at the time of sale.

309.   Oura knew that these statements were false or misleading when made. When those statements were made, Oura had already agreed to a sizeable strategic investment by a new investor that would significantly increase the valuation of the company. Oura's General Counsel told another investor, David Goto, to hold onto his shares to realize the increased valuation that Oura actively concealed from Plaintiff.

310.   All Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Shuman, Brecker, and Kim were able to and did, directly or indirectly, control the content of the statements made to Plaintiff. As officers and directors, Shuman, Brecker, and Kim had a duty to disseminate timely, accurate, and truthful information with respect to Oura's businesses, future financial condition, and prospects.

311.   As described above, all Defendants acted with scienter throughout the relevant time period, in that they either had actual knowledge of the misrepresentations and omissions of material facts in the statements made to Plaintiff, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

312.   Defendants misrepresented Oura's financial condition for the purpose of inducing Plaintiff to sell his shares at an artificially low price, and to induce Plaintiff to forfeit his rights as a shareholder to authorize the Series D investment and to vote on further stock repurchases. In other words, Defendants misrepresented Oura's financials to deceive Plaintiff into taking action

that was against his own best interests, for the benefit of Defendants. Defendants were unjustly enriched by their misrepresentations.

313.    Defendants' misrepresentations caused Plaintiff significant and measurable economic losses. Plaintiff sold his shares at an artificially low value, depriving him of the significant gains in Oura's stock price that resulted from the increased valuation of the Company.

314.    By engaging in the conduct described above, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

315.    As an equitable remedy for these violations, Plaintiff seeks rescission of his agreement to sell his shares and to transfer the shares back from Oura to him through the imposition of a constructive trust.

### COUNT FOUR
### Control Person Liability: Violation of Section 20(a) of Exchange Act
### (Against Defendants David Shuman and Eurie Kim)

316.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

317.    Throughout the relevant period, Shuman and Kim participated in the operation and management of Oura, and participated, directly and indirectly, in the conduct of Oura's business affairs. Because of their senior positions, as members of Oura's Board, they knew non-public information about Oura's business prospects, including that Oura had agreed to a significant strategic investment that was to be announced in October 2024.

318.    Shuman participated directly in Defendants' fraudulent scheme by, among other things, initiating the amendment to the shareholder agreement that gave Oura's Board total discretion over repurchases of Oura stock, and leveraging his position as a member of Oura's Board to block secondary sales of Oura stock.

54

319.    Kim participated directly in Defendants' fraudulent scheme by, among other things, leveraging her position as Chair of Oura's Board to block secondary sales of Oura stock, including the sale that Plaintiff proposed in July 2022.

320.    In their capacities as Oura Board members, Shuman and Kim had direct involvement in the day-to-day operations of the Company and reviewing and approving the statements that Oura made to shareholders. Throughout the relevant period, Shuman and Kim exercised their power and authority to cause Oura to engage in the wrongful acts complained of herein. Shuman and Kim were therefore "controlling persons" of Oura within the meaning of Section 20(a) of the Exchange Act. In their respective capacities, they participated in the unlawful conduct alleged which artificially deflated the price of Oura's securities.

321.    By reason of their positions as Board members of Oura, Shuman and Kim had the power and influence to direct the actions of, and exercised the same to cause, Oura to engage in the unlawful acts and conduct complained of herein.

322.    By reason of the above conduct, Shuman and Kim are jointly and severally liable, under Section 20(a) of the Exchange Act, for the violations committed by Oura.

### COUNT FIVE
### Negligent Misrepresentation
### (Against Defendants Ouraring, Oura Oy, Oura Inc., and Sean Brecker)

323.    Plaintiff incorporates preceding paragraphs as if fully set forth herein, only to the extent, however, that the allegation does not allege fraud, scienter, or Defendants' intent to defraud Plaintiff. Specifically, Plaintiff incorporates all preceding paragraphs, except 1, 2, 3, 8, 12, 15, 17, 20, 73, 83, 91, 87-99, 142, 143, 152, 159, 195-199, 208, 209, 214, 231, 232, 235, 243, 244, and 247-276.

324.    Plaintiff asserts only a claim for negligence and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Plaintiff does not allege that

liability under this Count arises from any scienter or fraudulent intent, which are not required elements of a claim for negligent misrepresentation. All the proceeding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

325.    Oura, and its directors and officers, owed a fiduciary duty to Plaintiff, a major shareholder of Oura and its former Chief Executive Officer. Plaintiff depended on Defendants to provide information about Oura's financial status when he was evaluating whether it was in his best interest to sell his shares in the Company in September 2024.

326.    Defendants owed Plaintiff a pecuniary duty to disclose the Company's pending investments with Dexcom and Fidelity, and to provide him accurate information in the context of the private sale of Plaintiff's Oura stock.

327.    Defendants supplied Plaintiff with several pieces of false information in response to direct questions posed by Plaintiff. That false information includes, but is not limited to, that the buyer of Plaintiff's Oura stock was an existing investor in Oura who was "non-strategic." Defendants failed to disclose that Oura had reached an agreement with Dexcom and others to provide a major strategic investment in the Company that would significantly increase Oura's valuation.

328.    Defendants failed to exercise reasonable care in obtaining or communicating that information. When those statements were made, Oura had already agreed to a sizeable strategic investment by a new investor that would significantly increase the valuation of the company.

329.    Plaintiff was justified in relying on the information provided by Oura's Chief Financial Officer and Oura's broker-agent. Plaintiff sold his shares and forfeited his voting rights based on a mistaken understanding of Oura's valuation and financing.

330.    Plaintiff suffered pecuniary loss caused by his reliance on the false information provided by Defendants. As a result, Defendants were unjustly enriched.

331.    Plaintiff seeks share rescission to transfer the shares back from Oura to him.

332.    Plaintiff also seeks the imposition of a constructive trust for share rescission, whereby the improperly purchased shares shall be held in trust for Plaintiff pending resolution of this dispute.

## COUNT SIX
## Breach of Fiduciary Duty
## (Against Defendant Sean Brecker)

333.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein, but only to the extent that the allegation does not allege fraud, scienter, or Brecker's intent to defraud Plaintiff. Specifically, Plaintiff incorporates all preceding paragraphs, except 1, 2, 3, 8, 12, 15, 17, 20, 73, 83, 91, 87-99, 142, 143, 152, 159, 195-199, 208, 209, 214, 231, 232, 235, 243, 244, and 247-276.

334.    Plaintiff asserts only strict liability and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Plaintiff does not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a claim for breach of fiduciary duty. All the proceeding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

335.    Sean Brecker was at all relevant times an officer of Oura.

336.    As an Oura officer, Brecker was aware that Oura had negotiated a Series D round of funding, including a significant strategic investment by Dexcom, and that these investments significantly increase Oura's valuation and share price.

337.    As an Oura shareholder, Plaintiff was ignorant of this investment.

57

338.   Brecker solicited Plaintiff to sell his shares in Oura before this investment was announced to the public. Brecker did so for the specific purpose of inducing Plaintiff to sell his shares at an artificially low price.

339.   In the context of the private stock sale between Oura and Plaintiff, Brecker owed a fiduciary duty to disclose the Series D financing. That investment was of a sufficient magnitude to constitute a special fact that Brecker was required to disclose.

340.   Brecker did not disclose the Dexcom investment even though Plaintiff specifically asked whether the buyer of his stock was a strategic investor.

341.   Brecker's failure to disclose the investment misled Plaintiff, in breach of Brecker's fiduciary duties.

342.   Had Brecker disclosed the strategic investment, Rai would not have agreed to sell his shares to Oura and forfeit his voting rights in September 2024.

343.   Brecker's violation of his fiduciary duties had the purpose and effect of unjustly enriching Defendants.

## COUNT SEVEN
## Aiding-and-Abetting Breach of Fiduciary Duty
## (Against Defendant David Shuman)

344.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein, but only to the extent that the allegation does not allege fraud, scienter, or any intent to defraud Plaintiff. Specifically, Plaintiff incorporates all preceding paragraphs, except 1, 2, 3, 8, 12, 15, 17, 20, 73, 83, 91, 87-99, 142, 143, 152, 159, 195-199, 208, 209, 214, 231, 232, 235, 243, 244, and 247-276.

345.   Plaintiff asserts only strict liability and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Plaintiff does not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a claim

58

for breach of fiduciary duty or aiding-and-abetting fiduciary duty. All the proceeding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

346. As alleged above, Sean Brecker owed Plaintiff a fiduciary duty to disclose Oura's upcoming financing and breached that duty by failing to disclose that investment.

347. David Shuman knew that Brecker was negotiating a purchase of Rai's Oura shares in September 2024 and knew that Oura had reached agreement for a Series D financing round at a valuation of more than $5 billion.

348. Given the magnitude of that investment, Shuman was aware that Brecker owed a fiduciary duty to Rai to disclose that investment in the context of a private stock sale. Oura's counsel had previously instructed Shuman, in the context of discussions to buy back stock from Oura's founders, that Oura's officers and directors were duty-bound to disclose the pending Series C financing.

349. Shuman actively participated in the breach of Brecker's fiduciary duties by, among other things, instructing Brecker to conceal from Rai the existence of the Series D funding, and exercising approval rights over the purchase of Rai's shares. Shuman assisted Brecker's breaches to ensure that Oura would buy back sufficient shares at a low enough price that the Series D share issuance would be non-dilutive to existing shareholders like Shuman.

350. As alleged above, Plaintiff was damaged by these breaches of fiduciary duties. Plaintiff would not have agreed to sell his shares to Oura and forfeit his voting rights in September 2024 had the strategic investment been disclosed in him.

## COUNT EIGHT
### Violation of New Hampshire Uniform Securities Law
### N.H. Rev. Stat. § 421-B:5-509
### (Against All Defendants)

351.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein, but only to the extent that the allegation does not allege fraud, scienter, or Defendants' intent to defraud Plaintiff. Specifically, Plaintiff incorporates all preceding paragraphs, except 1, 2, 3, 8, 12, 15, 17, 20, 73, 83, 91, 87-99, 142, 143, 152, 159, 195-199, 208, 209, 214, 231, 232, 235, 243, 244, and 247-276.

352.    Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Plaintiff does not allege that liability under this Count arises from any scienter or fraudulent intent, which are not required elements of a claim under N.H. Rev. Stat. Ann. § 421-B:5-509. All the proceeding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

353.    Oura offered to purchase securities from Plaintiff on August 26, 2024, through its broker-agent Jason Nelford. Oura's offer was directed to Meredith, New Hampshire, Plaintiff's place of residence, and received at the place to which it was directed.

354.    Plaintiff accepted Oura's offer and sold his securities from Oura on September 22, 2024. Plaintiff's sale was made and accepted in New Hampshire, when Plaintiff executed the Stock Repurchase Agreement and Voting Rights Agreement from his place of residence in Meredith, New Hampshire.

355.    Oura made several untrue statements of fact in connection with Plaintiff's sale of securities. These untrue statements included: (a) that the buyer of Plaintiff's Oura stock was an existing investor in Oura, and (b) that the buyer of Plaintiff's Oura stock was not a "strategic investor."

356.    Through Brecker and Nelford, Oura also omitted several facts which made its statements misleading in light of the circumstances they were made. Specifically, Oura failed to disclose that (a) Oura had reached an agreement with Dexcom for a significant strategic investment and (b) that this strategic investment would significantly increase the valuation of the company. These omitted facts made misleading Oura's statements about the nature of the investment in Oura and the capitalization table that Oura provided Plaintiff.

357.    At the time he agreed to sell his shares, Plaintiff did know of these untruths and omissions.

358.    Brecker had the apparent authority to act on behalf of Oura as its Chief Financial Officer. Nelford had the apparent authority to act on behalf of Oura as its broker and agent.

359.    Each of these facts was material to Plaintiff's decision to forfeit his voting rights and sell his Oura shares on September 22, 2024. Had Plaintiff known that Oura had agreed to a sizeable strategic investment from a new investor, he would not have sold his shares at that time. Plaintiff would have held onto his shares to realize the gains from that strategic investment. Any reasonable investor would have viewed the false or omitted information as significantly altering the total mix of information available at the time of sale.

360.    Defendants failed to exercise reasonable care in obtaining or communicating that information. When those statements were made, Oura had already agreed to a sizeable strategic investment by a new investor that would significantly increase the valuation of the company.

361.    Defendants were unjustly enriched by their misrepresentations.

362.    All Defendants are liable both, directly and indirectly, for the wrongs complained of herein. Because of their positions of control and authority, Shuman, Brecker, and Kim were able to and did, directly or indirectly, control the content of the statements made to Plaintiff. As

officers and directors, Shuman, Brecker, and Kim had a duty to disseminate timely, accurate, and truthful information with respect to Oura's businesses, future financial condition, and prospects.

363.    Each of Shuman, Brecker, and Kim, either had actual knowledge of the untruths and omissions alleged here or should have known about those untruths or omissions had they exercised reasonable care.

364.    As Officers and Directors, each of Shuman, Brecker, and Kim is jointly and severally liable for Oura's conduct pursuant to N.H. Rev. Stat. Ann. § 421-B:5-509(g).

365.    Had Plaintiff known of Defendants' misrepresentation and omissions, he would not have sold Oura securities at artificially deflated prices in September 2024, nor we would have forfeited his voting rights in Oura.

366.    By reason of the foregoing, Defendants are liable to Plaintiff, the seller of the securities at issue, under N.H. Rev. Stat. Ann. § 421-B:5-509.

367.    As a remedy for these violations, Plaintiff seeks to recover the securities that he sold due to Defendants' fraud, any income received on those securities, costs, and reasonable attorneys' fees determined by the court, and reasonable attorneys' fees determined by the court.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court award Plaintiff judgment against Defendants and award the following equitable relief:

A.    Rescission and restitution of Oura's purchase of Rai's shares;

B.    Imposing a constructive trust over the shares repurchased from Rai, and any traceable substitutes, proceeds, or benefits derived from those shares, and ordering Defendants to return the shares to Rai or, if return is not feasible, to provide restitution and disgorgement of the traceable benefits as equitable relief. Declaratory and injunctive relief;

62

C.      Ordering an accounting of all transfers, issuances, cancellations, or proceeds relating to the repurchased shares;

D.      Enjoining Defendants from transferring, pledging, encumbering, canceling, or otherwise disposing of the repurchased shares (or their traceable proceeds) during this action;

E.      Reasonable attorney's fees determined by the Court;

F.      All other and further equitable relief as the Court deems just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: May 29, 2026

**GRANT & EISENHOFER P.A.**

**DYNAMIS LLP**
Eric Rosen (*pro hac vice* to be filed)
Kaitlyn Gerber (*pro hac vice* to be filed)
175 Federal Street, Suite 1200
Boston, MA 02110
Tel: (646) 541-8484
erosen@dynamisllp.com
kgerber@dynamisllp.com

*/s/ Christine M. Mackintosh*
Christine M. Mackintosh (#5085)
Michael J. Barry (#4368)
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
cmackintosh@gelaw.com
mbarry@gelaw.com

**DYNAMIS LLP**
Constantine P. Economides (*pro hac vice* to be filed)
1 SE 3rd Avenue, Suite 1000
Miami, FL 33131
Tel: (305) 985-2959
ceconomides@dynamisllp.com

**DYNAMIS LLP**
Tyler Finn (*pro hac vice* to be filed)
233 Broadway, Suite 1750
New York, NY 10279
Tel: (212) 204-2757
tfinn@dynamisllp.com